PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 06-4100, 06-4101, 07-4690 and 08-1032

TRAVELERS CASUALTY AND SURETY COMPANY,
f/k/a The Aetna Casualty and Surety Company,

Appellant/Cross-Appellee

v.

\*INSURANCE COMPANY OF NORTH AMERICA

Appellee/Cross-Appellant

\* Per Court's Order of 10/7/08

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 01-cv-00098)
District Judge: Honorable William H. Yohn

Argued May 12, 2009

Before: AMBRO, ROTH and ALARCÓN[*], <u>Circuit Judges</u>

(Opinion filed June 9, 2010)

Vincent J. Proto, Esquire
Joseph J. Schiavone, Esquire (Argued)
Marc I. Bressman, Esquire
Donald P. Jacobs, Esquire
Budd, Larner, Gross, Rosenbaum, Greenberg & Sade
150 John F. Kennedy Parkway, 3rd Floor
Short Hills, NJ   07078-0999

      Counsel for Appellant/Cross Appellee
      Travelers Casualty and Surety Company

James M. Dennis, Esquire
Wayne R. Glaubinger, Esquire (Argued)
Olga Sekulic, Esquire
Mound, Cotton, Wollan & Greengrass
One Battery Park Plaza, 9th Floor
New York, NY   10004-0000

Lawrence Nathanson, Esquire
Siegal & Park
533 Fellowship Road, Suite 120
Mt. Laurel, NJ   08054

---

[*]Honorable Arthur L. Alarcón, Senior United States Circuit Judge for the Ninth Circuit Court of Appeals, sitting by designation.

Counsel for Appellee/Cross Appellant
Insurance Company of North America

---

OPINION OF THE COURT

---

AMBRO, Circuit Judge

This is a dispute over reinsurance coverage. In 1998, Travelers Casualty and Surety Co. ("Travelers") reached a $137 million settlement with its insured, Acme Corporation ("Acme").[1] Travelers then proceeded to allocate those $137 million dollars among three tiers of insurance coverage, only the highest of which—the so-called "excess" layer—included policies reinsured by Ace America Reinsurance Company and Insurance Company of North America (collectively, "INA"). When Travelers billed INA $13,762,395 based on its allocation, INA refused to pay, and Travelers sued to recover in the Eastern District of Pennsylvania.

---

[1] The actual name of the insured is subject to a confidentiality agreement with Travelers. Out of respect for that agreement, we refer to it here by a pseudonym, Acme Corporation, which we note stands for "A Company that Makes Everything." *See* Wikipedia, *Acme Corporation*, http://en/wikipedia.org/wiki/Acme_Corporation (last visited June 7, 2010).

At issue before the District Court was whether Travelers manipulated its post-settlement allocation so as to maximize the amount allocated to policies reinsured by INA, thus excusing INA from its normal duty as a reinsurer to "follow" all coverage decisions made by its reinsured. The District Court held two bench trials, each addressing a different aspect of Travelers' allocation, and ultimately reached what was, in effect, a split decision. The Court ruled, following the first bench trial, that Travelers had not manipulated its allocation of the settlement dollars so as to allow it to reach the excess layer of coverage (and thus tap into its reinsurance). But the Court also ruled after the second bench trial that, once Travelers reached the highest tier of coverage, it allocated more to certain policies reinsured by INA than was reasonably allowed by their policy limits. The result of those two verdicts was to leave INA responsible for only $8,226,817 of the loss initially allocated to it.

The Court then issued two consequential post-trial rulings. In the first, it held that prejudgment interest on Travelers' award should be calculated according to the Pennsylvania rate, even though the reinsurance contracts under which Travelers sued were governed by New York law. In the second, it held that post-judgment interest on the prejudgment interest did not begin to accrue until the District Court issued its order quantifying the amount of prejudgment interest due.

Both parties appealed.[2] We affirm both trial verdicts as well as the ruling concerning when post-judgment interest on the prejudgment interest began to accrue. However, because we believe that Travelers' award of prejudgment interest should be calculated according to the higher New York rate, we remand on that issue only so that the prejudgment interest can be recalculated.

## I. BACKGROUND

### A. The Follow-the-Fortunes Doctrine and the Reinsurance Relationship

Because the events that gave rise to this dispute occurred in the context of a relationship between an insurer (Travelers) and its reinsurer (INA), we begin with some background into the reinsurance relationship. Reinsurance is a mechanism "'by which one insurer insures the risk of another insurer.'" *N. River Ins. Co. v. ACE Am. Reins. Co.*, 361 F.3d 134, 137 (2d Cir. 2004) (*quoting People ex rel. Cont'l Ins. Co. v. Miller*, 70 N.E. 10, 12 (N.Y. 1904)). The insurer pays the reinsurer a premium in exchange for which the reinsurer assumes "a portion of the [insurer's] potential financial exposure under certain direct

---

[2] After the notices of appeal were filed in this case, Travelers settled with Ace America Reinsurance Company, leaving Insurance Company of North America as the sole appellee/cross-appellant.

5

insurance policies it has issued to its insured." *Id.* Obtaining reinsurance allows an insurer to diversify its risk exposure, thus increasing its "capacity to insure other customers and decreas[ing] the likelihood that . . . insolvency will result from any large claim." *N. River Ins. Co. v. CIGNA Reins. Co.*, 52 F.3d 1194, 1199 (3d Cir. 1995).

A crucial feature of the reinsurance relationship is that "[r]einsurance involves contracts of indemnity, not liability." *Unigard Sec. Ins. Co. v. N. River Ins. Co.*, 4 F.3d 1049, 1054 (2d Cir. 1993). That is, in providing reinsurance, the reinsurer acquires no direct liability to the original policyholder; rather, the reinsurer assumes an obligation to indemnify the insurer for payments it makes under the reinsured policies. *Id.* Indeed, a reinsurance agreement typically contains two specific provisions designed to prevent the reinsurance relationship from encroaching on coverage disputes between the insurer and its insured: a "follow-the-form" provision, in which the reinsurer agrees to reinsure the policies as written, and a "follow-the-fortunes" provision, in which the reinsurer agrees to "follow" the coverage provided by the insurer. *See CIGNA*, 52 F.3d at 1199–1200.

Of these two provisions, the most crucial is the follow-the-fortunes provision. *See* Barry R. Ostrager & Mary Kay Vyskocil, *Modern Reinsurance Law & Practice* § 2.03[d] (2d ed. 2000), at 2-17 (noting that the "follow-the-fortunes" provision lies "at the heart of the reinsurance agreement"). The

6

follow-the-fortunes doctrine significantly restricts a reinsurer's ability to challenge the coverage decisions that led to its liability to the insurer. This is so for a basic reason—"[i]f the [insurer] knew that its settlement decisions could be challenged by every reinsurer, there would be little incentive to settle with the insured. The costs and risks of litigation avoided by settling with the insured would only be revived at the reinsurance stage." *Commercial Union Ins. Co. v. Seven Provinces Ins. Co.*, 9 F. Supp. 2d 49, 66 (D. Mass. 1998); *see also CIGNA*, 52 F.3d at 1206 ("To permit the reinsurer to revisit coverage issues resolved between the insurer and its insured would place insurers in the untenable position of advancing defenses in coverage contests that would be used against them by reinsurers seeking to deny coverage.").

Accordingly, the follow-the-fortunes doctrine "insulates a reinsured's liability determinations from challenge by a reinsurer unless they are . . . in bad faith, or the payments are clearly beyond the scope of the original policy."[3] *ACE*, 361 F.3d at 140 (internal quotation marks and citation omitted). In other words, a reinsurer seeking to avoid payment must show either that the coverage decisions that led to the reinsurer's liability to

---

[3] There is a third ground on which a reinsurer can deny payment for a covered loss—when such a loss was "expressly excluded by terms of" the reinsurance contract. *CIGNA*, 52 F.3d at 1200. That particular exception to the follow-the-fortunes doctrine is not at issue here.

7

the insurer were made in bad faith, or that the coverage provided clearly fell outside the scope of the policies the reinsurer agreed to reinsure. *See Mentor Ins. Co. (U.K.) Ltd. v. Brannkasse*, 996 F.2d 506, 517 (2d Cir. 1993). Otherwise, the reinsurer must simply cover the losses allocated to it.

**B.      Acme v. Travelers and Travelers v. INA**

In April 1996, Travelers acquired Aetna Casualty and Surety Company ("Aetna CS"). At the time, Acme was seeking coverage under insurance policies issued by Aetna CS in the 1970s and 1980s. Acme sought coverage primarily for two sets of claims being brought against it: (1) breast implant claims, relating to safety testing of silicone breast implants that Acme had performed for its parent, Acme Parent Corporation[4] ("Acme Parent"); and (2) chemical products claims, relating to chemical products manufactured by Acme, including the pesticide commonly known as "DBCP."[5] The Aetna CS policies potentially implicated by the breast implant claims and the chemical products claims made up three distinct layers of coverage—primary policies (bearing the designator "AL"),

_____

[4] As is obvious, this too is a pseudonym.

[5] In addition, Acme was seeking coverage under policies Travelers had issued to Acme prior to Travelers' acquisition of Aetna CS for numerous claims relating to environmental damage.

8

buffer policies (bearing the designator "XS"), and excess policies (bearing the designator "XN").[6] Because the distinct features of each layer's policies became central to the dispute between Travelers and INA that followed, it is worth describing those policies in some detail.

### 1.     The Insurance Policies

The AL policies were issued between April 1976 and April 1987 and provided coverage for all non-products claims brought against Acme, as well as products claims brought against it outside the United States. Each of the AL policies had a per-occurrence coverage limit, but only the policies issued between April 1985 and April 1987 had aggregate coverage limits.

In addition, the AL policies had three features that became particularly significant to the reinsurance dispute that followed. First, the policies were subject to retrospective premiums from Acme. For any payment Travelers made on an AL policy, it was entitled to reimbursement from Acme up to that particular policy's "loss limit."[7] The AL policies covering

---

[6] Aetna CS was not Acme's sole insurer, as it purchased coverage from multiple providers.

[7] The relevant loss limits were: $250,000 for the policies covering the period from April 1978 through to April 1985;

9

the period from April 1976 through April 1982 included a limit on the amount in retrospective premiums that could be collected, while the post-April 1982 AL policies included no such limit. Second, the AL policies were subject to captive reinsurance, that is, reinsurance provided by an Acme subsidiary. Each AL policy was reinsured for 95% of all losses above the loss limit, except the last policy, which was reinsured at 95.5% above the loss limit.[8] Finally, the AL policies included an obligation to cover defense expenses in addition to an obligation to indemnify Acme for liability it incurred. For the April 1976 through April 1982 AL policies only, defense costs did not count toward the

---

$500,000 for the policies covering the period from April 1985 through to April 1986; and $1 million for the policies covering the period from April 1986 through to April 1987.

[8] As will be discussed in greater detail below, the combined effect of the retrospective premiums and the captive reinsurance was that, under many coverage scenarios, Acme, not Travelers, would be responsible for the vast bulk of the loss covered by the AL policies. As experts for both parties explained at trial, during the years in which this coverage was purchased, companies like Acme were typically unable to find outside insurers willing to offer primary coverage. Thus, they would often (as Acme did with respect to its products coverage) provide their own primary coverage through a subsidiary, or (as Acme did with respect to the AL policies) obtain outside coverage specifically by agreeing to reassume the bulk of the risk from the insurer.

10

policy limits, while, for all the AL policies, captive reinsurance could not be sought for defense costs unless Travelers also made indemnity payments to Acme.

The XS policies covered the period between April 1976 and April 1982. They provided United States products liability coverage and were in excess of Acme's primary layer of products liability coverage, meaning that they were only available to Acme once its primary layer of products liability coverage (which was supplied by a Acme subsidiary) was exhausted.[9] The XS policies were also subject to captive reinsurance. The policies spanning from April 1976 to April 1978 were 100% reinsured for bodily injury claims, while the remaining XS policies were 95% reinsured for all claims.

The XN policies provided the final layer of coverage. These policies covered both products and non-products claims, and were in excess of all Acme's insurance coverage (including its coverage under the AL and the XS policies).[10] While none of the XN policies was subject to either retrospective premiums or captive reinsurance, the XN layer was the one layer that did

[9] The attachment points for the XS policies—that is, the point at which their coverage kicked in—were $2.4 million or $4 million, depending on the specific policy.

[10] The XN policies attached at between $9 million and $200 million.

11

possess non-captive reinsurance, including reinsurance from INA.[11] INA assumed, through facultative reinsurance certificates,[12] a portion of nine of the XN policies. Each certificate issued by INA contained both a follow-the-form provision and a follow-the-fortunes provision.

## 2. The Settlement Negotiations

Acme initially sought coverage for the tens of thousands of breast implant claims brought against it under the AL policies, and sought coverage for the chemical products claims under both the XS policies and the XN policies.[13] At first,

---

[11] For ease of reference, the term "reinsurance" will hereinafter be used to refer exclusively to the type of reinsurance provided by INA, that is, non-captive reinsurance. The term "captive reinsurance" will be used to refer to the type of reinsurance provided by Acme's subsidiaries.

[12] "Facultative reinsurance" refers to reinsurance on specific insurance policies, rather than reinsurance on all the coverage provided to a particular insured, which is generally referred to as "treaty reinsurance." *See Travelers Cas. & Sur. Co. v. Gerling Global Reins. Corp. of Am.*, 419 F.3d 181, 184 n.3 (2d Cir. 2005).

[13] Acme also sought coverage for the chemical products claims from Travelers (not Aetna CS) under products liability policies that had been issued by Travelers in the 1950s.

12

Aetna CS declined coverage, and then, starting in February 1996, made a series of settlement offers to Acme, each of which was rejected. Upon its acquisition of Aetna CS, Travelers restarted settlement negotiations from scratch. Negotiations were handled, from Travelers' end, by Timothy Yessman, who was Senior Vice President of Travelers' Special Liability Group, and Susan Stonehill-Clafin, who was General Counsel for Travelers' Environmental Litigation Group. Yessman acted as lead negotiator, while Stonehill-Clafin provided legal advice.

Up to that point, Acme had not yet settled, or received an adverse judgment on, any of the claims against it, but had incurred substantial defense costs. Accordingly, the parties focused initially on reaching a "coverage-in-place" deal. Under such an arrangement, Travelers would agree to pay a fixed sum to cover Acme's past losses, and, for Acme's future losses, the parties would work out a formula for matching the specific claims against Acme to the specific insurance policies. Travelers would then make payments pursuant to that formula—subject to a finite cap—as Acme's ultimate liability developed.

In its negotiations with Acme about how to characterize the claims for which coverage was being sought, Travelers was

Travelers refers to these policies as the "TIC" policies because they were written by Travelers Indemnity Co. We continue that usage.

adamant about two points—that the breast implant claims were products claims, and thus were not covered by the AL policies,[14] and that they arose out of a single occurrence (namely, a single act of negligent testing on Acme's part). According to testimony Yessman later provided, it was the number of occurrences issue that was viewed as the most critical. Because the AL policies possessed per-occurrence limits, but were not (for the most part) subject to aggregate limits, Travelers' greatest concern was that the breast implant claims would be characterized as non-products claims arising out of multiple occurrences. Under such a scenario, it was possible that Travelers' exposure under the AL policies would be exponentially greater, at least if the liability for each occurrence was below the per-occurrence limit.[15]

---

[14] One of the reasons why Travelers wanted the breast implant claims characterized as products claims was that fewer dollars were available under the XN policies for products claims than for non-products claims. That is because, prior to Travelers' acquisition of Aetna CS, it and Acme Parent had reached a settlement relating to a different set of breast implant claims and characterized them as products claims. The result of that settlement was that a significant portion of the XN policy limits for products claims had already been exhausted.

[15] In addition, because the pre-April 1982 AL policies included a limit on the amount of retrospective premiums that could be collected, Travelers would have been limited in its ability to shift its loss back to Acme under such a scenario.

While the negotiations with Acme were ongoing, Yessman had Mark Wigmore, a Vice-President and Associate General Counsel in Travelers' reinsurance department, produce a memo (the "Wigmore Memo") that became central to the litigation that followed.[16] The Wigmore Memo explored the reinsurance implications of different coverage scenarios for the breast implant claims. The Memo noted a number of issues of potential concern, only two of which are particularly germane to this appeal. First, the Memo suggested that, because Travelers could not collect captive reinsurance on payments made to cover defense costs unless it also paid out in indemnity, it was possible that "Acme [would] litigate each and every case to the fullest extent, without making any settlements, in order to avoid its . . . reinsurance obligations." (J.A. at 615.) Second, the Memo mentioned that, if the breast implant claims were determined to be non-products claims arising out of multiple occurrences, Acme might never get out of the AL layer of coverage and into the reinsured XN layer, since, if the liability for each occurrence was low enough, it was possible that it would never exhaust the per-occurrence limits of the AL policies not subject to aggregate limits. The Memo also

---

[16] The exact date of the Wigmore Memo is unclear, as the copy in the record is undated and neither Yessman nor Wigmore testified as to its precise date. What is undisputed is that it was produced at some time between when Travelers acquired Aetna CS in April 1996 and when Travelers and Acme reached a tentative settlement in July 1998.

speculated that, if Travelers were to bill its reinsurers based on a single occurrence characterization, "[c]ollection [from them would] likely . . . be more difficult," but that, if Acme agreed to that characterization in any settlement, Travelers "would have a strong position" in "litigation or arbitration" with its reinsurers. (J.A. at 616.)

The final settlement meeting between Travelers and Acme took place on July 7, 1998, at which point both parties changed their approach. Acme proposed moving to an all-cash net settlement. That meant that, rather than (as with a coverage-in-place deal) coming up with a formula for how to treat Acme's future losses, Travelers would simply pay Acme a lump sum—forgoing both retrospective premiums and captive reinsurance—in exchange for Acme releasing all of its future claims under the policies.[17] Travelers accepted the proposal and, with the new framework in place, the parties quickly agreed on a figure of $137 million. They then decided that, of that $137 million, $80 million would be dedicated to the breast implant claims, $20 million would be dedicated to the chemical products claims, and the remaining $37 million would go to claims that are not at issue in this case. In addition, the parties agreed that the breast implant claims would be treated as non-products, single occurrence claims, while the chemical products claims would be treated as products claims. Beyond that, they did not

---

[17] The idea of doing a "net" settlement was not new, as Acme had insisted on a net arrangement from the onset of negotiations.

16

come to any agreement about how to allocate the settlement to the specific policies potentially implicated.

### 3. The Final Settlement Agreement

Although Travelers and Acme reached an agreement in principle during the July 7, 1998 meeting, the settlement was not finalized until September of that year. The primary issue in dispute was Travelers' proposed allocation of the agreed-upon sum among the different policies. According to Robert Miley, who, along with William Kingston, was primarily responsible for drafting the settlement agreement on behalf of Travelers,[18] it was not that Acme objected to Travelers' proposed allocation so much as that it "wondered whether . . . it [*i.e.*, the allocation language] needed to be . . . in the settlement agreement." (Trial Tr. vol. 1, 216, Jan. 11, 2005.)

In a draft dated July 27, Travelers included language indicating that, of the $20 million dedicated to the chemical products claims, $5 million would be allocated to the TIC policies, while the remaining $15 million would be allocated to the XN policies. That draft also included language providing that no amount could be allocated to the post-April 1982 AL policies. In a draft returned to Travelers on September 1, Acme crossed out most of the allocation language, put a question mark

---

[18] Stonehill-Clafin worked on the settlement as well, but left for maternity leave shortly after the drafting process began.

17

next to the line indicating that the post-April 1982 AL policies were not to be used, and added language stating that, with the exception of any allocations specifically set forth in the agreement, each party reserved the right to allocate the settlement as it pleased.  In a draft returned on September 4, Acme continued to designate the allocation language "IN DISPUTE," and specifically crossed out the section regarding allocation to the post-April 1982 AL policies.

The settlement agreement became final in mid-September.  It provided that Travelers' payments to Acme were "net of any reinsurance obligations the Acme Insurance Subsidiaries have or may have to Travelers and net of any retrospective premium or other obligations Acme has or may have to Travelers."  It also included the language indicating that the $20 million for the chemical products claims would be divided between the TIC policies ($5 million) and the XN policies ($15 million).  In addition, the final version included a paragraph providing that "[n]o payments . . . shall be allocated to any [AL] Primary Policies with a policy period commencing on or after April 1, 1982, or to any . . . XS Policies because the payments of the Settlement Amount are net payments and such Policies have been exhausted by virtue of the settlement."  Lastly, the final version provided that "[w]ith the exception of the agreements explicitly set forth in . . . this Agreement, Acme and Travelers each reserve to themselves the right to allocate any or all of the Settlement Amount to any Policy; Acme will not be deemed to concur in any such allocation by Travelers,

18

and Travelers will not be deemed to concur in any such allocation by Acme." In the subsequent litigation with INA, Travelers conceded that the allocation language was included in the settlement agreement at its behest.

### 4. The Post-Settlement Allocation and Reinsurance Billing

Once the settlement agreement was finalized, Miley and Kingston proceeded to allocate the settlement among the different policies. As agreed, of the $20 million dedicated to the chemical products claims, $5 million was allocated to the TIC policies and $15 million to the XN policies. Travelers characterized the $80 million dedicated to the breast implant claims entirely as indemnity, not defense coverage. In allocating that $80 million, Travelers began with the AL layer of policies, but, in accord with the agreement, confined itself to the pre-April 1982 AL policies. In allocating within that layer, it employed the so-called "fill the bathtub" method.[19] Starting with the earliest of the policies, Travelers allocated to each eligible AL policy up to its single-occurrence limit (minus the

_____

[19] Under the "fill the bathtub," or "rising bathtub," method of allocation, "losses are allocated to the lowest layer of coverage first and, like a bathtub, fill[ed] from the bottom layer up. Under th[is] approach, a given layer of coverage is not implicated until the layer beneath it is completely exhausted." *ACE*, 361 F.3d at 138 n.6.

amount owed in retrospective premiums) before moving on to the next policy.[20] This resulted in a total of $24 million being allocated to the AL policies. The remaining $56 million of the $80 million dedicated to the breast implant claims was then allocated to the XN policies in accordance with the fill-the-bathtub method (starting with the XN policies with the lowest attachment points). Two of the XN policies implicated by Travelers' allocation of the breast implant claims settlement had three-year policy periods. In exhausting those three-year policies (each of which was reinsured by INA), Travelers treated their per-occurrence limits as applying separately to each policy year, a decision that tripled the amount that could be allocated to those policies.

Ultimately, six of the nine XN policies reinsured by INA had settlement dollars allocated to them. Pursuant to its allocation, Travelers billed INA $11,604,328 for the breast implant claims and $2,158,067 for the chemical products claims. Travelers agrees that the following decisions likely increased the amount of its coverage it was able to allocate to INA—(1) treating the breast implant claims as arising out of a single occurrence; (2) bypassing the post-April 1982 AL policies in allocating the $80 million dedicated to the breast implant claims; (3) bypassing the XS policies in allocating the $20 million

---

[20] Thus, for a policy with a $2.5 million per-occurrence limit and a $150,000 loss limit, Travelers allocated $2,350,000 of the $80 million to it before moving on to the next policy.

20

dedicated to the chemical products claims; (4) not allocating the $80 million for the breast implant claims exclusively to defense costs (even though, at the time of the settlement, Acme had not yet incurred any liability on those claims); and (5) allocating to the three-year XN policies on the assumption that their per-occurrence limits applied separately to each policy year.[21] The decision to annualize the per-occurrence limits alone resulted in an increase of $5,535,578 to the amount of loss assigned to INA. At any rate, INA refused to pay any of the amount Travelers allocated to it.

## C.    The District Court Proceedings

In January 2001, Travelers brought its breach of contract action against INA, contending that INA was barred, under the follow-the-fortunes doctrine, from challenging Traveler's resolution of its coverage dispute with Acme. In insisting that it was not obligated to pay, INA did not question the propriety of the underlying $137 million settlement. Rather, it challenged only Travelers' post-settlement allocation of that settlement.

At the close of discovery, both parties moved for summary judgment. In August 2004, the District Court denied

---

[21] Travelers does not, however, concede that any of these decisions was made for the express purpose of increasing its reinsurance recovery. It merely admits that they may have had that effect.

both parties' motions for summary judgment and the case proceeded to two separate bench trials. The first trial ("Phase I") addressed whether Travelers had engineered its post-settlement allocation to maximize the amount of the settlement that ended up in the reinsured XN layer of coverage. The second trial ("Phase II") addressed the propriety of Travelers' decision, once it reached the XN layer, to treat the three-year policies as subject to three separate per-occurrence limits.

Prior to the Phase I bench trial, INA made a motion *in limine* seeking to preclude testimony relating to discussions with, or analyses prepared by, Travelers' in-house[22] or outside counsel. In its motion, INA asserted that, under the so-called "sword/shield" doctrine, Travelers could not both invoke a privilege to shield its communications with its attorneys (as it had throughout discovery) and defend its conduct with reference to advice received by counsel. The District Court partially denied and partially granted the motion, limiting Travelers' testimony on its advice from counsel to the topic, rather than the content, of those communications. Ultimately, the Court ruled that Travelers could refer generally to its use of counsel in

---

[22] Of the individuals who worked on the different stages of the settlement with Acme, only Yessman was not in-house counsel. (Yessman has a law degree, but Travelers' position was that he acted as a "businessman," not a lawyer, during the process.) The category of in-house counsel therefore included Stonehill-Clafin, Miley and Kingston.

making certain decisions to show that it proceeded in a "businesslike" manner, but could not attribute any particular decision to the advice of counsel. (J.A. at 30.)

The Phase I trial was held in January and February of 2005. The District Court heard testimony from both parties' experts, as well as the Travelers employees who worked on the settlement with Acme (including the post-settlement allocation and the reinsurance billing),[23] all of whom denied that reinsurance recovery considerations motivated any of their decisions. In December 2005, the District Court ruled in favor of Travelers on the issues addressed in the Phase I trial. The Court summed up its findings as follows:

> Although there is certainly enough evidence in the record to raise the suspicions of [INA], I generally find Travelers' witnesses to be credible. I further find that Travelers did not allocate the sum plaintiff owed under the settlement agreement to maximize its potential reinsurance recovery from [INA], that Travelers did not act in bad faith, and that its various actions were reasonable, businesslike

---

[23] Neither party called anyone from Acme to testify.

decisions made in good faith.

(J.A. at 57.)

The Phase II trial was held in February 2006. After once again hearing testimony from both parties' experts, as well as from Travelers' employees, the District Court ruled in INA's favor. The Court concluded that, under Michigan law (which governed the insurance policies Aetna CS had issued to Acme), "the three-year XN policies clearly and unambiguously have a single per-occurrence limit for the entire policy period." (J.A. at 96.) It therefore held that Travelers' interpretation of the those policies' per-occurrence limits was not binding on INA as its reinsurer. The Court then (in an order summing up both its Phase I and its Phase II rulings) entered judgment in favor of Travelers in the amount of $8,226,817, a figure derived by subtracting from Travelers' initial billing of $13,762,395 the $5,535,578 attributable to its decision to annualize the per-occurrence limits of the three-year XN policies.

Next, the District Court issued two consequential post-trial orders. First, it held that, though the reinsurance contracts between Travelers and INA were governed by New York law, it was required, as a federal court sitting in diversity in Pennsylvania, to calculate the prejudgment interest owed on Travelers' award under the (lower) Pennsylvania rate, as (according to the District Court) such a calculation falls under Pennsylvania's procedural, rather than its substantive, law.

24

Second, the Court held that post-judgment interest on Travelers' award of prejudgment interest did not begin to accrue until the Court issued its order quantifying the amount of prejudgment interest owed to Travelers, rather than (as Travelers contended) beginning to run when the Court first awarded Travelers a sum subject to prejudgment interest.

Both parties timely appealed.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under 28 U.S.C. § 1332(a)(1). We have jurisdiction under 28 U.S.C. § 1291.

In considering the appeals from the District Court's Phase I and Phase 2 bench trials, "we review [the] [D]istrict [C]ourt's findings of fact for clear error and its conclusions of law *de novo*." *McCutcheon v. Am.'s Servicing Co.*, 560 F.3d 143, 147 (3d Cir. 2009). When "confronted with mixed questions of fact and law, we apply the clearly erroneous standard except that the District Court's choice and interpretation of legal precepts remain subject to plenary review." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 201 (3d Cir. 2005). To the extent that the District Court's conclusions rested on credibility determinations, our review is particularly deferential. *See Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985) ("When findings are based on determinations regarding the credibility of witnesses, . . . even greater deference to the

25

trial court's findings [is required]; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said."). Nonetheless, a "trial judge may [not] insulate his [or her] findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness." *Id.* Finally, insofar as what is being challenged is an evidentiary ruling, not a specific finding of fact or conclusion of law, we review "for abuse of discretion." *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 412 (3d Cir. 2002).

Our review of the District Court's determination that Pennsylvania law applies to the calculation of Travelers' award of prejudgment interest is *de novo*. *See Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 226 (3d Cir. 2007) (explaining that a "District Court's choice of law determination" is subject to plenary review). The same is true of our review of the District Court's ruling with respect to when post-judgment interest on Travelers' prejudgment interest began to run, as post-judgment interest is governed by 28 U.S.C. § 1961(a) and "a question of statutory interpretation . . . requires *de novo* review." *Pell v. E.I. DuPont de Nemours & Co.*, 539 F.3d 292, 305 (3d Cir. 2008).

## III. CHOICE OF LAW

The parties agree that New York law governs the reinsurance certificates INA issued to Aetna CS (and which

26

Travelers is seeking to enforce). They further agree that Michigan law governs the policies under which coverage was provided to Acme. Whether Pennsylvania or New York law applies to the calculation of prejudgment interest is in dispute and will be addressed below.

## IV. DISCUSSION

INA is challenging the District Court's Phase I ruling. Travelers challenges the Court's Phase II ruling, along with its determinations that Pennsylvania law applies to the calculation of prejudgment interest and that post-judgment interest on the prejudgment interest did not begin to run until the Court's order quantifying the amount in prejudgment interest owed to Travelers. We discuss each of these challenges in turn.

### A. The Phase I Ruling

The Phase I trial concerned the bad faith exception to the reinsurer's duty to go along with the coverage provided by the insurer. More specifically, the Phase I trial addressed INA's allegation that Travelers manipulated its post-settlement allocation to allow it to reach the reinsured XN layer of coverage. The District Court ultimately rejected this challenge, holding that INA had failed to show bad faith on Travelers' part. We affirm.

27

### 1. The Insurer's Duty of Good Faith in the Post-Settlement Allocation Context

The primary purpose of the follow-the-fortunes doctrine is to prevent the reinsurance relationship from interfering with coverage disputes between the insurer and its insured. *See CIGNA*, 52 F.3d at 1199 (explaining that the doctrine "prevents reinsurers from second guessing good-faith settlements and obtaining de novo review of judgments of the [insurer's] liability to its insured"). As such, there is some dispute over whether that doctrine should apply to post-settlement allocations, especially where, as here, the allocation decisions being challenged were not the product of active bargaining between the insurer and the insured.[24] *See Employers Reins. Corp. v. Newcap Ins. Co.*, 209 F. Supp. 2d 1184, 1191 (D. Kan. 2002) (declining to apply the doctrine to an allocation decision that the insurer and insured left unresolved); Graydon S. Staring, *Law of Reinsurance* § 18.10 (4th ed. 2007), at 18-56 (suggesting that the doctrine should only apply to a particular allocation

---

[24] It is true that the final settlement agreement did dictate certain allocation decisions. But it is clear from the record of the negotiations over the final text of that agreement that the allocation language was inserted at Travelers' insistence, a point it has conceded during this litigation. The focus of active bargaining between the parties was the final dollar figure, not the details of the coverage Travelers would ultimately provide to Acme.

decision "if [it] was necessarily and genuinely part of the claims settlement process").

Nonetheless, the majority view, which INA does not contest, is that the doctrine does apply to post-settlement allocations. *See, e.g.*, *Travelers Cas. & Sur. Co. v. Gerling Global Reins. Corp. of Am.*, 419 F.3d 181, 188–89 (2d Cir. 2005); *ACE*, 361 F.3d at 140–41; *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Am. Re-Ins. Co.*, 441 F Supp. 2d 646, 652–53 (S.D.N.Y. 2006); *Commercial Union*, 9 F. Supp. 2d at 67–68. We join those courts here. A contrary holding would risk doing precisely what the follow-the-fortunes doctrine aims to prevent—interfering in settlement negotiations between insurers and their insureds by discouraging a particular type of settlement (here, an all-cash deal).

However, "applying the follow-the-[fortunes] doctrine to post-settlement allocation decisions does not leave a reinsurer without protection." *ACE*, 361 F.3d at 141. Those allocations must still have been in "good faith" to be binding on the reinsurer. *Id.* We have broadly characterized the insurer's duty of good faith to its reinsurer as a duty not to take advantage of the reinsurer's dependence on the decisions made by the insurer. *See CIGNA*, 52 F.3d at 1216 ("[T]he duty of good faith requires the reinsured to align its interests with those of the reinsurer."). In the post-settlement allocation context, this means that an insurer breaches this duty when it makes allocation decisions primarily for the purpose of increasing its reinsurance recovery.

29

*See Allstate Ins. Co. v. Am. Home Assurance Co.*, 837 N.Y.S.2d 138, 144 (N.Y. App. Div. 2007) ("A reinsurer is not bound by the follow-the-fortunes doctrine where the reinsured's settlement allocation . . . reflects an effort to maximize unreasonably the amount of collectible reinsurance."); *see also Hartford Accident & Indem. Co. v. Columbia Cas. Co.*, 98 F. Supp. 2d 251, 259 (D. Conn. 2000) (denying summary judgment to an insurer "in light of the inferences of unreasonableness or self-service that can be drawn" from the details of its post-settlement allocation).

We make clear, however, that the insurer's negative duty not to make allocation decisions primarily in order to increase reinsurance recovery does not translate into a positive duty on the part of the insurer to minimize its reinsurance recovery. *See Gerling*, 419 F.3d at 193 ("[An insurer] choosing among several reasonable allocation possibilities is surely not required to choose the allocation that *minimizes* its reinsurance recovery to avoid a finding of bad faith." (emphasis in original)). What this means for the reinsurer's burden of persuasion is that, to establish a breach of the duty of good faith, it is not sufficient simply to demonstrate that a particular allocation decision increased the insurer's access to reinsurance, at least not where the insurer is able to point to some legitimate (*i.e.*, non-reinsurance-related) reason for the challenged decision. *See id.* ("An allocation that increases reinsurance recovery—when made in the aftermath of a legitimate settlement and when chosen from multiple possible allocations—would rarely

30

demonstrate bad faith in and of itself."). To prevail, the reinsurer must either provide direct evidence that the insurer was motivated primarily by reinsurance considerations, or show that the after-the-fact rationales offered by the insurer are not credible. INA attempted to do both in this case.

## 2.     INA's Challenges

INA challenges the District Court's Phase I ruling essentially on three grounds. First, it asserts that three of the specific allocation decisions Travelers made—to bypass the post-April 1982 AL policies in allocating the breast implant claims settlement, to allocate the chemical products claims settlement without performing any independent analysis of how those claims matched up to its policies or without allocating any of the settlement amount to the XS policies, and to allocate the entire portion of the settlement dedicated to the breast implant claims as indemnity—are inexplicable except as part of a scheme to maximize Travelers' reinsurance recovery. Second, INA argues that the Wigmore Memo is direct evidence that Travelers improperly considered reinsurance implications in performing the allocation. And, finally, INA claims that the District Court's ruling was based on evidence that should have been excluded—namely, evidence that Travelers sought and received legal advice about how to handle its insurance coverage dispute with Acme.

31

#### i.    The Bypassing of the Post-April 1982 AL Policies in Allocating the Breast Implant Claims Settlement

In allocating the $80 million of the settlement dedicated to the breast implant claims, Travelers allocated $24 million to the pre-April 1982 AL policies and nothing to the post-April 1982 AL policies. The District Court held that this decision was not evidence of bad-faith maximization because it followed from the "net" nature of the settlement Travelers reached with Acme.[25] (J.A. at 50.) While we disagree with some of the details of the District Court's analysis, we end up at the same place—*i.e.*, concluding that bypassing the post-April 1982 AL policies was reasonable in light of the net nature of the settlement.

The District Court's specific reasoning was that, because

---

[25] The District Court also noted that the final settlement agreement dictated that the post-April 1982 AL policies be bypassed. We are uncomfortable attributing much significance to that under the facts of this case. As noted above, the exchanges between Acme and Travelers over the text of the final agreement strongly suggest that this language was inserted into the agreement entirely at Travelers' behest and was not the product of any give-and-take between the parties. We are reluctant to adopt a rule whereby an insurer could insulate its allocation from challenge by its reinsurer simply by getting its, essentially indifferent, insured to agree to it.

32

the post-April 1982 AL policies were subject to both retrospective premiums and captive reinsurance, "there was no real risk transfer" under those policies, and thus "any allocation to [them] would have contravened the 'net' deal with Acme." (J.A. at 50.) Strictly speaking, however, it is not true that the net nature of the settlement prevented Travelers from allocating to these policies. As INA notes, the only thing Travelers was required to do on account of the net settlement was not bill Acme for either retrospective premiums or captive reinsurance. Indeed, the pre-April 1982 AL policies were also subject to retrospective premiums and captive reinsurance. Yet that did not prevent Travelers from doing, with respect to those policies, what INA contends it was required to do with respect to the post-April 1982 AL policies—allocate to them up to their per-occurrence limits (minus the amount Acme would have owed it in retrospective premiums), and then simply not ask for any captive reinsurance back.

The District Court concluded that Travelers was justified in treating the pre- and-post April 1982 AL policies differently for allocation purposes because the latter, but not the former, had unlimited retrospective premiums available to them. But, as both Miley (who was largely responsible for the post-settlement allocation) and Travelers' expert, Robert Hall, conceded at trial, this difference would not have come into play under a single-occurrence allocation. That is because, under a single-occurrence allocation, the per-occurrence limits would have been exhausted long before the retrospective premiums available

33

under the pre-April 1982 AL policies were exhausted. Indeed, the position advanced at trial by Miley and Hall was that Travelers should have bypassed *all* the AL policies, not (as the District Court held) that Travelers was correct to bypass some, but not all, of those policies.

Nonetheless, we do not agree with INA that, because Travelers was not required to bypass the post-April 1982 AL policies, it was a breach of good faith for it to do so. Because Travelers was under no duty to minimize its reinsurance recovery, the mere fact that it could have, consistent with its agreement with Acme, allocated to all the AL policies does not mean that it was required to do so. The question we think more apt is whether the net nature of the settlement made bypassing the AL policies a reasonable option (even if it was one that, for reasons that are unclear, Travelers only took halfway). *See Gerling*, 419 F.3d at 193 (explaining that the follow-the-fortunes doctrine only requires that an allocation be "reasonable," not that it be the one allocation "among several reasonable allocation possibilities" that minimizes the burden on the reinsurer).

The position advanced by Travelers' experts at trial was that, because the AL policies did not provide for any significant risk transfer (at least not on a single-occurrence, indemnity-only, allocation), those policies were essentially exhausted by stipulation once the parties agreed to a net deal, thus authorizing Travelers to move on to the next layer of coverage. INA's

34

experts took the opposite position—namely, that the net deal simply waived Travelers' right to collect captive reinsurance, but did not alter the basic fact that an insurance policy is only exhausted when money is allocated to it up to the applicable coverage limit.

Fortunately for us, we need not wade into this quasi-metaphysical debate over what exhausting an insurance policy "really" requires. In this context, it is enough to note that INA has not shown that Travelers' position is unreasonable. The theory put forward by Travelers—that the net nature of the deal authorized it to allocate the settlement as if there were a prior step in which, for the policies subject to captive reinsurance, Travelers made payments to Acme and then received that money back—strikes us as plausible. Travelers' experts, whom the District Court found credible, testified that what Travelers did was consistent with industry practice. Given the very limited nature of the review authorized by the follow-the-fortunes doctrine, that is sufficient, even though there was contrary testimony by INA's experts.

In sum, we agree with the basic direction of the District Court's analysis, if not all of its details. The decision to bypass the post-April 1982 AL policies was reasonable in light of both the net nature of the deal with Acme and the specific characteristics of those policies. Accordingly, we cannot say that the decision is evidence of bad-faith maximization on Travelers' part.

### ii. The Allocation of the Chemical Products Claims Settlement

INA's second challenge focuses on Travelers' handling of the $20 million of the settlement dedicated to the chemical products claims. INA makes two arguments here. One of those arguments essentially reprises the one considered in the previous section, only this time directed toward Travelers' decision to bypass the XS layer of coverage in allocating the settlement dollars dedicated to the chemical products claims. The response is basically the same—the XS policies, although they provided coverage for products claims and attached at lower points than the XN policies, were subject to near-total reinsurance from Acme subsidiaries. Accordingly, it was not unreasonable for Travelers to view those policies as exhausted in virtue of the net settlement and skip straight to the XN layer.

INA's other challenge to the handling of the chemical products claims is new, however. It points out that there is nothing in the record to indicate that Travelers ever conducted a detailed analysis of the chemical products claims being brought against Acme before agreeing to allocate $20 million of the settlement to them. Thus, INA argues, Travelers' handling of these claims could not have been professionally reasonable, as it was not based on an analysis of either Acme's possible exposure under those claims or how those claims potentially matched up with the specific coverage available. Instead, Travelers began with a number—$20 million—and worked

36

backward from there.

We agree with the District Court that, under the circumstances, this approach was not unreasonable. Yessman testified that his main focus was on settling the breast implant claims for an amount Travelers could live with. Prior to the acquisition of Aetna CS by Travelers, Aetna CS had offered Acme a $300 million coverage-in-place deal just for the breast implant claims, which Acme rejected.[26] When Travelers took over Aetna CS's policies, it set up initial reserves of $100 million for the breast implant claims.[27] Given that, we cannot say that the decision to dedicate $20 million to the chemical products claims, in order to resolve the breast implant claims for only $80 million, was unreasonable, even if it were not grounded in the kind of analysis of the chemical products claims that one expects to see.

---

[26] Because this was a coverage-in-place offer, the $300 million figure represents the most Aetna CS could have paid, not what it necessarily would have paid. Had Acme accepted the offer and then proceeded to incur less than that in liability on the breast implant claims, Aetna CS would not have had to pay out the full $300 million.

[27] Because these reserves were net of any reinsurance recovery that would have been available to Travelers, the $100 million reserve corresponded to an even larger potential settlement with Acme.

### iii.　The Indemnity-Only Allocation

Travelers allocated the $80 million dedicated to the breast implant claims exclusively as indemnity. It did this despite the fact that, at the time of the settlement, Acme had spent substantial sums defending itself from those claims ($112 million), but had not yet incurred any liability on them. INA asserts that this is unambiguous evidence of bad-faith maximization on Travelers' part, since allocating the settlement exclusively as indemnity increased Travelers' ability to get out of the AL layer of coverage and into the XN layer. We, however, are not convinced that the District Court erred in holding to the contrary.

We note initially that, while Acme had yet to incur any liability on the breast implant claims when the settlement was reached, that does not mean that the only reasonable option was to allocate that portion of the settlement exclusively as defense costs. Travelers' settlement with Acme released all of Acme's past and future claims under the policies. It was thus not unreasonable for Travelers to view the settlement as covering Acme's yet-to-materialize liability. This is significant because the only scenario in which paying defense costs would have prevented Travelers from getting out of the AL layer at all—at least on a single-occurrence allocation—was one in which it

38

paid out nothing, or very little, in indemnity.[28]

Still, the decision to allocate this portion of the settlement entirely as indemnity, as opposed to dedicating a portion to Acme's liability and a portion to Acme's defense costs, likely allowed Travelers to allocate more to the XN layer of coverage than it otherwise could have, as defense costs would not have counted toward the limits of the pre-April 1982 AL policies. Moreover, that decision appears to have been largely unilateral on Travelers' part, as there is no record of Acme and Travelers ever agreeing to a framework for handling the defense costs versus indemnity issue, nor was that issue addressed in the final settlement agreement.

Yet we are not inclined to depart from the District Court's finding that the decision to allocate the $80 million exclusively as indemnity was sufficiently grounded in Travelers' prior interactions with Acme that it cannot be characterized as

---

[28] This is so for two reasons. First, Travelers could only claim captive reinsurance on its defense costs payments to the extent that it also paid out in indemnity. Thus, if it only covered defense costs, its exposure under the AL policies would have been significantly greater. Second, for the April 1976 through April 1982 AL policies, defense costs did not count toward the policy limits, which means that Travelers would not have exhausted those policies had it not also paid up to their per-occurrence limits in indemnity.

solely an attempt to maximize Travelers' reinsurance recovery. Yessman and Stonehill-Clafin both testified that, during their early negotiations with Acme, Travelers made a coverage-in-place offer that included $15 million for past defense costs, and $26 million for future defense costs and liability, only to be told that the $15 million for past defense costs was "within ballpark," but the $26 million figure was "too low." (Trial Tr. vol. 1, 438, Jan. 12, 2005.) From that, Yessman reportedly concluded that recouping past defense costs was not that important to Acme, a position that both Yessman and one of Travelers' experts, Jerold Oshinsky, testified was consistent with their experience with large policyholders, who tend to be more interested in achieving coverage certainty going forward than in recovering past losses. In addition, Travelers knew that Acme would be getting defense coverage from another carrier, the Fireman's Fund, and, as one of INA's own experts noted, it is typical for a policyholder in Acme's position to choose one insurer among several to cover defense costs.

Given this context, we cannot say that the District Court's conclusion that "[t]he sum for the breast implant claims was reasonably and in a businesslike manner paid as indemnity and not as defense costs" was clearly erroneous. (J.A. at 44.)

### iv. The Wigmore Memo

INA contends that each of the specific allocation decisions it cites as questionable must be read against the

40

backdrop of the Wigmore Memo, which it characterizes as direct evidence that Travelers allocated the settlement with an eye toward maximizing its reinsurance recovery. Travelers conceded at trial that it is a breach of the duty of good faith for an insurer to take reinsurance implications into account in making coverage decisions.

The District Court concluded that the Wigmore Memo was not evidence that Travelers had generally acted in bad faith. It did so on two grounds. First, the Court essentially accepted Yessman's testimony that the Memo's purpose was to provide him with a general estimate of Travelers' potential net exposure on the breast implant claims, which Travelers wanted in relation to an indemnity agreement it had entered into with Aetna U.S. Healthcare when it acquired Aetna CS,[29] and that he did not use the Memo to aid him in his negotiations with Acme. Second, the Court accepted the testimony of Stonehill-Clafin, Miley and Kingston (who, according to Travelers, were the ones responsible for the details of the settlement agreement and the post-settlement allocation), all of whom testified that they never saw, or heard of, the Wigmore Memo prior to the subsequent litigation, and that, as a general matter, they were walled off

_____

[29] According to Yessman's testimony, Travelers was concerned enough about the breast implant claims that it did not agree to acquire Aetna CS until Aetna U.S. Healthcare agreed to indemnify Travelers for some portion of its net loss covering those claims (*i.e.*, its loss after reinsurance recovery).

41

completely from any information relevant to Travelers' reinsurance recovery prospects.

In its brief, INA cites various reasons why we should not find Yessman credible on this subject, despite the District Court's having found otherwise. It is unnecessary to detail those reasons here. That is because, even were we to agree that Yessman's testimony was not credible—and also agree that Yessman's exposure to the Wigmore Memo contaminated the other Travelers' employees who worked on the settlement and allocation, and whose credibility INA does not contest—that would not change the result.

The Wigmore Memo's two main points of emphasis are: (1) that, if the breast implant claims were characterized as arising out of multiple occurrences, the coverage was likely to stay in the AL layer; and (2) that, because Acme's subsidiaries were not obligated to provide reinsurance so long as only defense costs are covered, there was the possibility that Acme would continue to litigate each of the claims without settling. But neither of those points is particularly pertinent to what INA is challenging here. First, as noted above, Travelers had sufficient reasons, apart from concerns about reinsurance recovery, to want to avoid a multiple-occurrence scenario, since such a scenario would have greatly increased its exposure under

the AL policies.[30]   Thus, the Wigmore Memo is not itself sufficient to show that Travelers insisted on a single-occurrence characterization of the breast implant claims for reasons related to reinsurance recovery (and, at any rate, INA does not raise the number of occurrences issue on appeal).  Second, the specific point the Memo raised about defense costs was that, until Travelers covered any losses stemming from liability, it could not access the captive reinsurance.  The Memo said nothing about what is at issue here—namely, the effect of defense coverage on Travelers' ability to recover from its outside reinsurers.

In sum, we do not discern clear error regarding the District Court's finding that "[t]he Wigmore Memo was not used as a 'roadmap' by Travelers to negotiate [the] settlement with Acme, or to allocate the settlement dollars to the insurance policies." (J.A. at 57.)

---

[30] This was true only for a coverage-in-place agreement rather than an all-cash deal like the one ultimately reached. (On an all-cash deal, the characterization of the claims for which Acme was seeking coverage did not affect Travelers' liability to Acme.)  However, at the time the Wigmore Memo was written, Travelers was pursuing a coverage-in-place deal.

43

### v. The Sword/Shield Doctrine

Finally, INA argues that, even if it is not entitled to a reversal of the District Court's Phase I order, that order should still be vacated, as (according to INA) the District Court based its ruling on evidence that should have been excluded. More specifically, INA contends that it was improper for the District Court to draw inferences in Travelers' favor based on its consultations with outside and in-house counsel. INA's argument is that, because Travelers invoked the attorney-client and work-product privileges to shield the substance of those consultations, it should not have been allowed to defend its conduct with reference to those consultations. *See United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) ("[T]he attorney-client privilege cannot at once be used as a shield and a sword. . . . Thus, the privilege may implicitly be waived when [the party claiming the privilege] asserts a claim that in fairness requires examination of protected communications." (internal citations omitted)).

INA is correct that the District Court drew inferences in Travelers' favor based on the bare fact that, in connection with the Acme settlement, it received advice from attorneys experienced with insurance-coverage disputes. In particular, it found Travelers' receipt of such advice to be evidence that it generally handled the settlement in a "reasonable" and "businesslike" manner. (J.A. at 61.) But we do not agree that the District Court's Phase I ruling depended on those inferences.

44

The Court's conclusion that INA failed to show bad faith on Travelers' part was sufficiently supported by its findings that: (1) the specific allocation decisions challenged by INA could be accounted for without reference to intentional maximization; and (2) the Travelers employees most responsible for the details of the post-settlement allocation were screened off from the reinsurance implications of their decisions. Accordingly, it is unnecessary for us to determine whether a party that refers generally to having received advice from counsel in order to establish a pattern of businesslike conduct waives any associated privileges. Even were the District Court's consideration of the disputed testimony error, it was harmless. *See Hirst v. Inverness Hotel Corp.*, 544 F.3d 221, 228 (3d Cir. 2008) ("Discretionary evidentiary rulings will give rise to reversible error only where a substantial right of the party is affected." (internal quotation marks and citation omitted)).

\* \* \* \* \*

In sum, we agree with the District Court that "there is . . . enough evidence . . . to raise . . . suspicions" that Travelers engineered its post-settlement allocation to maximize its reinsurance recovery. (J.A. at 57.) That is why the District Court was correct to deny summary judgment to Travelers, despite the very deferential nature of the scrutiny authorized by the follow-the-fortunes doctrine. However, reviewing the District Court's findings with the deference we must, we also agree that INA did not meet its burden at trial of showing that

45

the allocation decisions it was challenging were driven primarily by reinsurance considerations. Accordingly, we affirm the Phase I order in Travelers' favor.

**B.     The Phase II Ruling**

The Phase II trial addressed one particular aspect of Travelers' allocation of the settlement—its decision, in allocating the breast implant claims settlement, to treat the per-occurrence limits of the two three-year XN policies reinsured by INA as applying separately to each policy year. INA argued that it was not bound by Travelers' decision to allocate that much of the breast implant claims settlement to those two policies. That was because (according to INA) that allocation enlarged the limits of those policies beyond what INA agreed to reinsure. The District Court agreed, ruling in INA's favor. We affirm.

**1.     The Policy Language**

It is well settled that "a reinsurer cannot be held liable for a kind of loss that it did not agree to cover." *CIGNA*, 52 F.3d at 1206–07. "This distinction between reinsured and unreinsured risk is particularly important in facultative reinsurance where the reinsurer accepts only specific risks." *Id.* at 1207. At the same time, however, the "'follow the fortunes' doctrine creates an exception to the general rule that contract interpretation is subject to de novo review." *Id.* at 1206. Thus, to prevail in its challenge, INA had to show more than that, of the different

46

reasonable interpretations of the relevant policy language, its is the most persuasive. Rather, INA was required to show that, under Michigan law (which both parties agree controls interpretation of the XN policies), the "underlying policy language . . . unambiguously provides that" the per-occurrence limits are not subject to the treatment Travelers gave them (*i.e.*, as applying separately to each policy year). *Id.* at 1207 (internal quotation marks and citation omitted).

Under Michigan law, an insurance policy is viewed "much the same as any other contract." *Auto-Owners Ins. Co. v. Churchman*, 489 N.W.2d 431, 433 (Mich. 1992). That is, an insurance policy is treated as "an agreement between the parties in which a court will determine what the agreement was and effectuate the intent of the parties." *Id.* Where "the terms of the contract are clear," those terms must be enforced "as written." *Frankenmuth Mut. Ins. Co. v. Masters*, 595 N.W.2d 832, 837 (Mich. 1999). In interpreting such a contract, a court may not "create ambiguity where none exists." *Auto-Owners*, 489 N.W.2d at 434.

The two XN policies at issue here—01 XN 247 and 01 XN 752—are three-year policies. The language of the two policies is identical, except that the limit provided for the former is $4.5 million, while for the latter it is $8 million.[31] Policy 01

_____

[31] As noted above, each facultative certificate issued by INA contained a "follow-the-forms" clause. The general rule is that

47

XN 752 reads in pertinent part as follows:

LIMITS OF LIABILITY:

53.33% ($8,000,000. MAXIMUM)
QUOTA SHARE OF $15,000,000.

---

> [w]here a following form clause is found in the reinsurance contract, concurrency between the policy of reinsurance and the reinsured policy is presumed, such that a policy of reinsurance will be construed as offering the same terms, conditions and scope of coverage as exist in the reinsured policy, i.e., in the absence of explicit language in the policy of reinsurance to the contrary.

*Aetna Cas. & Sur. Co. v. Home Ins. Co.*, 882 F. Supp. 1328, 1337 (S.D.N.Y. 1995). As the District Court observed, there is nothing in the certificates issued by INA that clearly restricts INA's reinsurance coverage beyond the limits stated in the underlying policies. Thus, the question of whether INA is bound by Travelers' decision to annualize the per-occurrence limits of three-year policies hinges entirely on whether that decision was a reasonable interpretation of how the underlying policies' per-occurrence limits operated.

48

EACH OCCURRENCE

53%  ($8,000,000.  MAXIMUM)
QUOTE SHARE OF $15,000,000.
ANNUAL AGGREGATE

As this makes clear, the policy is subject to two separate limits—an aggregate limit and a per-occurrence limit. Travelers concedes that the aggregate limit applied only to products claims. Thus, that limit is not at issue here because the breast implant claims were treated as non-product claims. But the aggregate limit is modified by the word "annual," while the "each occurrence" limit is not. As the District Court noted, that is a strong indication that the aggregate limit was meant to operate annually, while the per-occurrence limit was not. This conclusion is further bolstered by the language of the "Indemnity Agreement" portion of the XN policies, which provides in pertinent part that "[Travelers] will indemnify the INSURED against EXCESS NET LOSS arising out of an accident or occurrence during the policy period." The clear implication, again, is that the term "accident or occurrence" is linked with the entire policy period—in this case, three years—rather than being linked separately to each policy year.

The XN policies do not contain a definition of the term "occurrence." However, each XN policy incorporates the terms and conditions of its underlying controlling policy (except with respect to certain terms not at issue here). These policies were

49

issued by the Home Insurance Company, and define an "occurrence" as follows:

> The term occurrence wherever used herein shall mean an accident, or a happening, or event, or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premise's location shall be deemed one occurrence.

This definition clearly contemplates "continuous" occurrences that are capable of spanning multiple years (*e.g.*, environmental contamination). Such a definition is inconsistent with treating an occurrence as a separate liability trigger for each policy year.

In sum, there is nothing in the relevant policy language to suggest any ambiguity with respect to whether the policies' per-occurrence limits are intended to apply separately to each policy year. On the contrary, the language indicates that the per-occurrence limits—unlike the aggregate limits—are meant to cover the entire policy period. This was the position advanced

by INA's expert, who testified (credibly, according to the District Court) that he had never heard of a company interpreting three-year policies like the ones at issue here in the manner Travelers did. Thus, the District Court's conclusion that "under Michigan law the three-year XN policies clearly and unambiguously have a single per-occurrence limit for the entire policy period" is well founded. (J.A. at 96.)

## 2. Travelers' Argument

On appeal, Travelers does not appear to challenge the details of the District Court's interpretation of the two XN policies (by, for instance, pointing to sources of ambiguity in the policy language overlooked by the Court). Rather, Travelers argues that the kind of analysis performed by the District Court—one that involved "applying general rules of contract construction to in effect predict what a Michigan court would do if presented with the issue"—is insufficient to support a judgment against it. (Travelers' Br. at 32.) According to Travelers, its right to bind INA to its interpretation of the relevant per-occurrence limits follows from the fact that "[w]hen Travelers made the annualization decision, there was no Michigan law on the insurance annualization issue, and there was a body of out-of-state law that had reached diametrically different conclusions as to whether a multi-year insurance contract with a per-occurrence limit should be interpreted as having an annual per-occurrence limit." *Id.* at 34. That, Travelers argues, was enough to preclude INA from

51

establishing—as it must, under the follow-the-fortunes doctrine—that Travelers' approach was not even arguably authorized by the underlying policies.[32]

We are not convinced. Travelers bases its contention on our decision in *CIGNA*. There, we addressed a reinsurer's argument that the policy it reinsured (which was governed by Ohio law) could not reasonably be interpreted as authorizing

---

[32] Indeed, Travelers argues that, once the District Court concluded at the summary judgment stage both that there was no Michigan law directly on point, and that there were non-Michigan decisions supporting annualization, it should have immediately entered judgment in Travelers' favor. *See* Travelers' Br. at 24. Because (as explained below) we reject the premise that this was enough to entitle Travelers to judgment as a matter of law, we need not determine whether this is one of those rare instances in which a court of appeals should review a denial of a summary judgment motion after a trial on the merits. *See Chemetall GMBH v. ZR Energy, Inc.*, 320 F.3d 714, 718 (7th Cir. 2003) (explaining that denials of summary judgment are generally unreviewable after a trial on the merits because "[o]nce the trial has taken place, [the] focus is on the evidence actually admitted and not on the earlier summary judgment record"); *Banuelos v. Constr. Laborers' Trust Funds for S. Cal.*, 382 F.3d 897, 902 (9th Cir. 2004) (making an exception to that rule when the earlier denial of summary judgment was predicated on "an error of law that, if not made, would have required the [D]istrict [C]ourt to grant the motion").

coverage of defense costs. *CIGNA*, 52 F.3d at 1207. We noted that, under the follow-the-fortunes doctrine, the reinsurer bore the "burden to prove that Ohio law would not support" an interpretation that made the insurer liable for defense costs. *Id.* at 1209–10. In concluding that the reinsurer had not met that burden, we observed that it "ha[d] neither relied on nor cited to any Ohio case directly on point. Nor have we found any." *Id.* at 1210. Travelers asserts that this language indicates that the absence of any "on-point" Michigan decision at the time it performed the allocation somehow fully resolves the issue in its favor.

Once that language is put in its proper context, however, we believe that it does not support the position Travelers advocates here. Prior to the passage quoted above about the absence of any pertinent Ohio case, the *CIGNA* Court had already determined that the underlying insurance policy was ambiguous on the question of whether defense costs were covered. *Id*. at 1208–09. The specific point being made was that, in the face of ambiguity in the underlying insurance contract, a reinsurer cannot prevail simply by citing favorable decisions from non-controlling jurisdictions, but must instead rely on decisions from the state whose law governs the dispute. *See id.* at 1210. In other words, the analysis endorsed in *CIGNA* is that, where the policy language is ambiguous with respect to the issue in dispute, a reinsurer can only meet its burden under the follow-the-fortunes doctrine by pointing to a controlling decision definitively resolving the ambiguity in its favor. But

53

that is quite different than the rule Travelers urges us to adopt here—namely, that the absence of an on-point decision from the relevant jurisdiction by some alchemy renders the underlying policy language ambiguous. Because Travelers has not provided any reason for us to doubt the District Court's conclusion that the policy language unambiguously excludes annualizing the per-occurrence policy limits, the absence of any on-point Michigan decision is of no aid to Travelers.

Nor are we persuaded by Travelers' citation to *Commercial Union Insurance Co. v. Swiss Reinsurance America Corp.*, 413 F.3d 121 (1st Cir. 2005), and *American Employers' Insurance Co. v. Swiss Reinsurance America Corp.*, 413 F.3d 129 (1st Cir. 2005). Both those cases, like this one, involved a reinsurer's claim that it was not obligated to follow its reinsured's decision to annualize the per-occurrence of its multi-year policies. *Commercial Union*, 413 F.3d at 122; *Am. Employers'*, 413 F.3d at 134. In each, the Court vacated the District Court's prior decision in favor of the reinsurer. *Commercial Union*, 413 F.3d at 129; *Am. Employers'*, 413 F.3d at 139. Travelers contends that these decisions indicate that the approach it took to the per-occurrence limits is sufficiently within the zone of reasonableness to be binding under the follow-the-fortunes standard.

Neither of those cases applies, however. In both, the insurer was able to produce what Travelers has been unable to provide here—some reasonable basis for its annualization

54

decision beyond simply the claim that, at the time, such a decision was not ruled out by the applicable body of law.[33]   In *Commercial Union*, while the excess policies provided by Commercial Union contained a definition of an "occurrence . . . hostile to annualization," those policies also included "follow-the-form provisions" incorporating the underlying primary policies, policies that did explicitly provide that their per-occurrence limits applied on an annual basis.  413 F.3d at 126. Thus, there were grounds for Commercial Union to conclude, prior to billing its reinsurer, that it might be exposed to its insured based on annualization, a possibility that had been explicitly raised by "Commercial Union's outside coverage counsel."  *Id.*  In *American Employers'*, the insurer's internal assessments of its potential liability assumed annualization.  413 F.3d at 136–37.  In addition, there were reasons for American Employers to suspect that any resulting coverage dispute might be governed by New Jersey law, "which is arguably pro-

---

[33] In his Phase II testimony, Miley explained the decision to treat the per-occurrence limits as applying separately to each policy year by saying that "there is a dispute in the insurance coverage world about whether or not for a single occurrence a multi-year policy would pay an occurrence limit for each year of that policy, or one overall occurrence limit," that the decision "seemed . . . reasonable," and that it was one to which he "just naturally gravitated towards . . . because it really had not been a huge dispute in this case."  (Trial Tr. vol. 4, 1826, 1914, Feb. 21, 2006.)

55

annualization." *Id*. at 137. Again, this provided a basis, prior to its billing of its reinsurer, for American Employers to measure its potential liability based on annualization.

There is nothing like that here. Travelers attempts to create something analogous by claiming that, before it entered the picture, Aetna CS had negotiated with Acme based on annualization assumptions. Travelers' evidence for this is a "Term Sheet" that Aetna CS provided to Acme indicating that the total non-products coverage available under the XN policies for each occurrence was $226.5 million (the figure reached through annualization), not $178.5 million (the figure reached without annualization). But, as noted above, negotiations with Acme started over from scratch after Travelers acquired Aetna CS. Indeed, Travelers concedes that the issue of annualization never came up between Travelers and Acme either prior to, or after, the parties reached a tentative deal in July 1998.[34] Moreover, Acme would not have had any reason to insist that Travelers annualize the per-occurrence limits of the XN policies because, under the settlement they reached, Travelers was only providing $80 million in coverage for the breast implant claims,

---

[34] Yessman testified that the reason the issue never came up, at least prior to the July 1998 agreement, was that he deliberately avoided raising it, as it was only relevant if the breast implant claims were treated as non-products claims and Travelers' official position was that those claims were products claims.

which meant that there was more than enough coverage available even without annualizing the limits. Thus, Travelers' attempt to explain why it annualized the per-occurrence limits of the three-year XN policies with reference to its interactions with Acme is unconvincing.

In sum, Travelers has pointed to nothing in the policy language, its prior assessments of its potential liability, or its interactions with Acme to indicate that, when it performed its allocation, it was reasonable to expect that, had the coverage dispute been litigated, Acme could have successfully pressed the annualization issue against it, or even that it would have had any reason to do so. As such, we affirm the District Court's Phase II ruling that INA is not bound by Travelers' decision to annualize the per-occurrence limits of the policies INA reinsured.

C.    The Rate of Prejudgment Interest

The combined effect of the District Court's Phase I and Phase II rulings was to leave Travelers entitled to $8,226,817 in damages from INA. The Court then turned to the issue of prejudgment interest, specifically whether such interest was to be calculated according to the New York rate of 9%, N.Y. C.P.L.R. § 5004, or the Pennsylvania rate of 6%, 41 Pa. Cons. Stat. § 202. The Court concluded that—even though the parties agreed New York law governed the reinsurance certificates that formed the basis of INA's liability to Travelers—Pennsylvania

57

law governed the calculation of prejudgment interest on the damages awarded to Travelers. That is because, according to the District Court, the law governing the calculation of prejudgment interest in Pennsylvania contract actions is procedural, rather than substantive, for choice-of-law purposes. We disagree with this characterization.

The District Court based its conclusion on *Yohannon v. Keene Corp.*, 924 F.2d 1255 (3d Cir. 1991), a case that concerned Pennsylvania Rule of Civil Procedure 238, which governs "delay damages"[35] in actions for "bodily injury, death[,] or property damage." Pa. R. Civ. P. 238(a)(1). More specifically, in *Yohannon* we addressed whether a federal court sitting in diversity in Pennsylvania must apply Rule 238 to tort damages even where (as here) the parties have stipulated that the law of another state governs their dispute. *Yohannon*, 924 F.2d at 1264. In answering yes to this question, we stressed that the Pennsylvania Supreme Court has repeatedly held that Rule 238 falls within the Court's authority "to make rules of procedure governing the administration of Pennsylvania's court system." *Id.* at 1265–66. From that, we predicted that the Court would also characterize Rule 238 as procedural for choice-of-law purposes. *Id.* at 1267. We thus held that a district court

---

[35] Although Rule 238 uses the term "delay damages," not prejudgment interest, the terms are interchangeable under Pennsylvania law. *See Daset Mining Corp. v. Indus. Fuels Corp.*, 473 A.2d 584, 596 (Pa. Super. Ct. 1984).

58

exercising diversity jurisdiction in Pennsylvania must apply Rule 238 to the calculation of prejudgment interest in tort cases, since a district court is bound by the choice-of-law rules of the state in which it sits. *Id.* at 1266–67 (*citing Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).

Travelers challenges the application of *Yohannon* to our case on two grounds. First, it argues that it was unnecessary for the District Court to perform any choice-of-law analysis at all, as the parties' agreement that New York law applies to the reinsurance contracts ought to control. This arguments rests on a misunderstanding of choice-of-law principles. Travelers is correct that, with respect to the substantive law that governs their dispute, "the first question to be answered [under both Pennsylvania law and the Restatement of Conflict of Laws] is whether the parties explicitly or implicitly have chosen the relevant law." *Assicurazioni Generali, S.P.A. v. Clover*, 195 F.3d 161, 164 (3d Cir. 1999). However, "[i]n conflicts cases involving procedural matters, Pennsylvania will apply its own procedural laws when it is serving as the forum state." *Commonwealth v. Sanchez*, 716 A.2d 1221, 1223 (Pa. 1998). Thus, if—as the District Court held—the calculation of prejudgment interest in contract actions falls under Pennsylvania's procedural law, that fully resolves the choice-of-law question, regardless of the parties' stipulations.

Travelers' second argument is that the District Court erred in extending *Yohannon*'s holding from Rule 238 to the

calculation of prejudgment interest in contract actions. To address this challenge, we must decide whether our prior prediction that the Supreme Court of Pennsylvania would consider Rule 238 procedural for choice-of-law purposes in tort actions requires us to predict that it would also characterize the rules governing the calculation of prejudgment interest in contract actions as procedural in nature.

The key to our conclusion in *Yohannon* was the Pennsylvania Supreme Court's "steadfast . . . position" that Rule 238 is procedural and not substantive. 924 F.2d at 1266. The analysis in *Yohannon* drew primarily on *Laudenberger v. Port Authority of Allegheny County*, 436 A.2d 147 (Pa. 1981), where the Pennsylvania Supreme Court—over "strong dissents and concurrences arguing that Rule 238" is unconstitutional, *Yohannon*, 924 F.2d at 1266—concluded that Rule 238 falls within its authority to "'prescribe general rules governing practice, procedure and the conduct of all courts . . . if such rules . . . neither abridge, enlarge, nor modify the substantive rights of any litigant[.]'"[36] 436 A.2d at 149 (*quoting* Pa. Const. art. V, § 10(c)) (first alteration in original). Because the Supreme Court "ha[d] never deviated" from this position, we concluded that it

---

[36] A new version of Rule 238 was adopted in 1988, after the *Laudenberger* decision. Nonetheless, the Pennsylvania Supreme Court has made clear that the analysis provided in *Laudenberger* applies to the current version of the Rule. *See Costa v. Lauderdale Beach Hotel*, 626 A.2d 566, 568 (Pa. 1993).

60

would "apply Rule 238 uniformly to a determination of pre-judgment interest without regard to its usual rules on choice of law." *Yohannon*, 924 F.2d at 1266–67.

By contrast, prejudgment interest in contract actions is called for by statute rather than by rule. *See* 41 Pa. Cons. Stat. § 202. The Pennsylvania Commonwealth Court had previously concluded that Rule 238 delay damages are available for any claim for "property damages," regardless whether it is in contract or tort. *See Loeffler v. Moutaintop Area Joint Sanitary Auth.*, 516 A.2d 848, 851–52 (Pa. Commw. Ct. 1986).

However, Pennsylvania's Supreme Court recently clarified the scope of Rule 238 and confirmed that it is limited to tort actions. *See Touloumes v. E.S.C. Inc.*, 899 A.2d 343, 349 (Pa. 2006) ("Rule 238 delay damages are not available in a breach of contract action where the damages sought are measurable by actual property damage.") Thus, unlike the Pennsylvania Supreme Court's "steadfast" insistence that delay damages under Rule 238 are procedural in nature in tort actions, there is no comparable body of precedent that suggests Pennsylvania courts in contract cases would characterize the pre-existing "legal right to pre-judgment interest in contract actions" as procedural. *Id.*

We thus predict that the Pennsylvania Supreme Court would conclude that prejudgment interest in contract actions is a substantive rather than a procedural matter, even were it to

analyze the issue under the framework laid out in *Laudenberger*. In concluding that Rule 238 is procedural, the *Laudenberger* Court reasoned as follows:

> Rule 238 awards damages for delay only in cases where the defendant made no settlement offer prior to trial or where the defendant made an offer of settlement which was 25% less than the amount of the jury verdict. . . . In those instances where the settlement offer is not accepted and the jury verdict does not exceed the offer by 25%, the interest is only computed up to the date of the settlement offer. By tolling the running of interest, this provision demonstrates the prominent goal of fostering *early* settlements. Undeniably, this rule serves to compensate the plaintiff for the inability to utilize funds rightfully due him, but the basic aim of the rule is to alleviate delay in the disposition of cases, thereby lessening congestion in the courts.

436 A.2d at 151 (emphasis in original). Thus, the Court held

that, while Rule 238 has the substantive effect of creating a right to compensation, its main purpose is procedural (*i.e.*, to govern litigation behavior), as evidenced by the fact that its "format . . . is responsive to [the] fundamental goal of prompting meaningful negotiations in major cases so as to unclutter the courts."[37] *Id.*

The key to *Laudenberger*'s holding, then, is that Rule 238 takes specific measures, beyond simply making awards of prejudgment interest available, to provide litigants with incentives to settle cases. In other words, the position advanced in *Laudenberger*—and extended to the choice-of-law context in *Yohannon*—is that Rule 238 is procedural, despite having some substantive elements, because its provisions are specially structured to relieve the burden on the courts by encouraging early settlements.

Pennsylvania's rules governing prejudgment interest in contract actions, on the other hand, are not similarly structured

---

[37] The only relevant change in Rule 238 post-*Laudenberger* is that, under the revised Rule, a defendant cannot be charged prejudgment interest for any period of delay attributable to the plaintiff. *See Schrock v. Albert Einstein Med. Ctr., Daroff Div.*, 589 A.2d 1103, 1106 (Pa. 1991) (explaining this change). That is consistent with *Laudenberger*'s analysis of the Rule's purpose—that it provides prejudgment interest to encourage defendants to make realistic settlement offers promptly.

63

to promote early settlement (even though they may have that effect). The statute that sets the rate of prejudgment interest in contract actions—41 Pa. Cons. Stat. § 202—does not provide any criterion to govern its application, but simply defines the "legal rate of interest" as "six per cent per annum." Under Pennsylvania law, eligibility for prejudgment interest in contract actions is governed by the Restatement (Second) of Contracts § 354. *See Fernandez v. Levin*, 548 A.2d 1191, 1193 (Pa. 1988). Section 354 provides in pertinent part that "[i]f the breach consists of a failure to pay a definite sum in money[,] . . . interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled." Restatement (Second) of Contracts § 354(1). Thus, under Pennsylvania law, where a plaintiff prevails in a contract action pertaining to "a definite sum," prejudgment interest is available as a matter of right starting from when the amount due under the contract was initially withheld. *See Fernandez*, 548 A.2d at 1193; *Palmgreen v. Palmer's Garage, Inc.*, 117 A.2d 721, 722 (Pa. 1955). And so, unlike in the case of tort damages, entitlement to prejudgment interest on contract damages does not depend on whether the defendant made a settlement offer, and, if so, how that offer compares to the amount ultimately awarded.

This further suggests that the Pennsylvania Supreme Court would not consider Pennsylvania's rules governing prejudgment interest in contract actions procedural, at least not if it were to analyze the issue under the framework laid out in

64

*Laudenberger*. We do not doubt that, by providing for an award of prejudgment interest as a matter of right in contract actions, Pennsylvania law encourages prompt settlement of contract disputes (at least relative to a legal regime in which such awards were not available). But there is nothing to indicate that doing so is the main goal of providing those awards. On the contrary, Pennsylvania courts have typically explained why prejudgment interest is available as a matter of right in contract actions with reference to a specifically compensatory purpose—to compensate for "the fact that the breaching party has deprived the injured party of using interest accrued on money which was rightfully due and owing to the injured party." *Widmer Eng'g, Inc. v. Dufalla*, 837 A.2d 459, 469 (Pa. Super. Ct. 2003); *see also Touloumes*, 899 A.2d at 348–49 (emphasizing that the compensatory purpose of Rule 238—"secur[ing] monies for the delay of relief"—"was already recognized by the legal right to pre-judgment interest in contract actions"); *Palmgreen*, 117 A.2d at 722 ("In all cases of contract[,] interest is allowable at the legal rate from the time payment is withheld after it has become the duty of the debtor to make such payment; allowance of such interest does not depend upon discretion but is a legal right.").

It is true that in *Laudenberger* the Court stated that Rule 238 also serves to compensate successful plaintiffs for the loss of the use of money to which they were entitled. *See* 436 A.2d at 151. Subsequent decisions have repeated that characterization. *See, e.g.*, *Willet v. Pa. Med. Catastrophe Loss*

65

*Fund*, 702 A.2d 850, 854 n.7 (Pa. 1997) (explaining that "the purpose of [R]ule [238] is to both compensate the plaintiff for the delay in receiving funds and to encourage the prompt resolution of meritorious claims"); *Schrock v. Albert Einstein Med. Ctr, Daroff Div.*, 589 A.2d 1103, 1106 (Pa. 1991) (same). But the theme of *Laudenberger* is that it is only because Rule 238 is structured to promote early settlement in the specific context of tort actions that it can be fairly characterized as procedural. *Cf. Touloumes*, 899 A.2d at 348 (noting that *Laudenberger* had "emphasiz[ed] the application of Rule 238 to tort litigation in explaining the reason[s] for [its] promulgation of [the] Rule," which "reflect[ed] the intention of the Court regarding the limited nature of the Rule and its inapplicability to breach of contract actions").

In *Schrock*, one of the cases in which Rule 238's compensatory elements were emphasized, Justice McDermott was moved to concur specifically in order to reiterate this understanding of the relationship between Rule 238's procedural and substantive elements:

> I write separately to re-emphasize that the *purpose* of Rule 238 is to alleviate delay in the disposition of cases. The fact that successful plaintiffs will recover interest on "money properly belonging" to them is an undeniable *byproduct* of

66

> the Rule, but not its purpose. . . . Rule 238 is a procedural exercise of the rule-making powers of this Court, not an exercise of our substantive judicial powers.

589 A.2d at 1107 (McDermott, J., concurring) (emphases in original) (internal citations omitted). We believe that this best captures the status of Rule 238 under Pennsylvania law—that it is procedural despite, not because of, the fact that it compensates successful parties for the loss of the use of their money. *See Laudenberger*, 436 A.2d at 151 ("Undeniably, this rule serves to compensate the plaintiff for the inability to utilize funds rightfully due him, but the basic aim of the rule is to alleviate delay in the disposition of cases, thereby lessening congestion in the courts.").

As such, we conclude that the better interpretation of Pennsylvania law on this issue is that, while Rule 238 serves a procedural purpose (combating the backlog in the courts) in a manner that incidentally affects the substantive right to be compensated for the loss of the use of one's money, the rules that govern prejudgment interest in contract actions do the reverse —they serve a compensatory purpose in a manner that only incidentally affects the number of cases that go to trial. Accordingly, the rationale provided in *Yohannon* for characterizing Rule 238 as procedural for choice-of-law purposes does not carry over to contract actions. We thus part

from the District Court's characterization of the Pennsylvania law governing the calculation of prejudgment interest in contract actions as procedural rather than substantive.

We believe on that basis that the District Court should have calculated the prejudgment interest owed to Travelers according to the New York rate. INA has conceded throughout this litigation that the reinsurance contracts Travelers sued to enforce are governed by the substantive law of New York. INA has cited no reason why a Pennsylvania court, if asked to determine which substantive law applies to the calculation of prejudgment interest, would depart from the understanding of the parties. Accordingly, we conclude that New York law applies here to the calculation of prejudgment interest. *See Assicurazioni*, 195 F.3d at 164–65 (explaining that, where the parties have "implicitly . . . chosen" a particular law to govern their contract dispute, that law controls under Pennsylvania's choice-of-law rules in the absence of a compelling reason to the contrary). We therefore remand with instructions to modify Travelers' award of prejudgment interest by calculating it according to the higher New York rate.

**D.      The Accrual Date of the Post-Judgment Interest on the Prejudgment Interest**

The final issue we address concerns the date on which post-judgment interest on the prejudgment interest began to

68

run.[38]  Travelers contends that post-judgment interest on the prejudgment interest began to accrue on August 14, 2006, when, following its Phase II ruling, the District Court entered judgment in favor of Travelers in the amount of $8,226,817 on its underlying reinsurance coverage claim.  The District Court held that the relevant date was December 5, 2007, when, following its resolution of the rate-of-prejudgment-interest issue, it entered a judgment requiring INA to pay Travelers $3,240,676.51 in prejudgment interest.[39]  We side with the District Court.

It is not hard to see the logic of Travelers' position.  The August 14, 2006 order, by establishing Travelers' entitlement to an award of damages, also established its entitlement to prejudgment interest on that award.  Post-judgment interest is typically understood as "compensation to ensure that a money judgment will be worth the same when it is actually received as it was when it was awarded."  *Dunn v. HOVIC*, 13 F.3d 58, 60 (3d Cir. 1993).  Thus, it makes sense that post-judgment interest on prejudgment interest would begin to run as soon as an order establishing the right to prejudgment interest is entered.  *See*

[38] As explained below, this issue is not affected by the fact that we are directing the District Court to revise its initial award of prejudgment interest.

[39] Technically, the judgment was issued by the District Court on December 3, 2007.  It was not entered by the Clerk of the Court until December 5, 2007.

*Caffery v. Unum Life Ins. Co.*, 302 F.3d 576, 590 (6th Cir. 2002) (holding that to allow a gap between when a party first became entitled to an award of prejudgment interest and when post-judgment interest on that award began to run would be contrary to "the compensatory goal of the postjudgment interest statute").

Nonetheless, our decision in *Eaves v. County of Cape May*, 239 F.3d 527 (3d Cir. 2001), precludes us from following that logic here. In *Eaves*, we addressed whether post-judgment interest on attorneys' fees "runs from the date that the District Court rules initially that the plaintiff is entitled to attorney[s'] fees, or alternatively, from the date that the District Court actually quantifies the amount awarded." *Id.* at 527–28. We ultimately concluded that "post-judgment interest on an attorney[s'] fee award runs from the date that the District Court enters a judgment quantifying the amount of fees owed . . .[,] rather than the date that the Court finds that the party is entitled to recover fees, if those determinations are made separately." *Id.* at 542. Applying *Eaves*' analysis to this case, the relevant date was December 5, 2007, when Travelers' award of prejudgment interest was quantified.

Travelers urges us to distinguish this case from *Eaves* on the ground that *Eaves* dealt with an award of attorneys' fees and we deal here with an award of prejudgment interest. We see no basis for doing so. The conclusion in *Eaves* was driven by a general reading of the requirements of 28 U.S.C. § 1961(a), the statute that provides for post-judgment interest, not anything

70

particular to attorneys' fees as a type of award. *See Eaves*, 239 F.3d at 538 (explaining that its result is based on the "plain language" of § 1961(a), rather than a fact-sensitive application of the policy considerations underlying the statute). Section 1961(a) provides in pertinent part that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court," and that "such interest shall be calculated from the date of the entry of the judgment . . . ." § 1961(a). What we held in *Eaves* was that (1) under § 1961(a), an award must be granted pursuant to a "money judgment" to trigger post-judgment interest, and (2) to count as a "money judgment" a judgment must include both "an identification of the parties for and against whom judgment is being entered," and "*a definite and certain designation of the amount . . .* owed." *Eaves*, 239 F.3d at 532–33 (*quoting Penn Terra Ltd. v. Dep't of Envtl. Res.*, 733 F.2d 267, 275 (3d Cir. 1984)) (emphasis in original). As such, *Eaves* requires us to read § 1961(a) as providing that, *as a general matter*, post-judgment interest on a particular award only starts running when a judgment quantifying that award has been entered. *See Skretvedt v. E.I. Dupont de Nemours*, 372 F.3d 193, 217 (3d Cir. 2004) (interpreting *Eaves* to stand for this general reading of § 1961(a)). Although there is much to criticize in *Eaves*, its interpretation of § 1961(a) controls until the Supreme Court, or our own Court *en banc*, says otherwise.

Accordingly, post-judgment interest on Travelers' award of prejudgment interest did not begin to run until the December 5, 2007 order was entered quantifying the amount in

71

prejudgment interest owed to Travelers. That the District Court incorrectly calculated the amount of prejudgment interest due (by using the Pennsylvania, rather than the New York, rate) does not change the date of accrual. *See Dunn*, 13 F.3d at 61–62 (explaining that, when a court of appeals merely modifies an award, that does not change the date on which post-judgment interest on that award began to run). We thus direct that the post-judgment interest on the District Court's revised calculation of prejudgment interest continue to run from the date on which the order quantifying the award was entered (December 5, 2007).

## V. CONCLUSION

For these reasons, we affirm the Phase I verdict, the Phase II verdict, and the District Court's order concerning the accrual date of post-judgment interest on the prejudgment interest. With respect to the Court's award of prejudgment interest to Travelers, we remand so that the award may be recalculated according to the New York rate.