NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 22-1994 and 22-2083

_____

DAVID KIVETT

v.

NEOLPHARMA, INC.; CEDIPROF, INC.;
NEOLPHARMA INTERNATIONAL, S.A. DE C.V.

Neolpharma, Inc.,
          Appellant in No. 22-1994

David Kivett,
          Appellant in No. 22-2083

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 2-20-cv-00664)
District Judge: Honorable Joshua D. Wolson

_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
on October 3, 2023

Before: SHWARTZ, MATEY, and SCIRICA, *Circuit Judges.*

(Filed: December 19, 2023)

_____

OPINION[*]

_____

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

**SCIRICA**, *Circuit Judge*

Before us are an appeal and cross-appeal[1] from a judgment following a bench trial. Appellee David Kivett proceeded against Appellant Neolpharma, Inc., alleging Neolpharma breached its contract with him when it failed to pay him a commission for new business he generated for Neolpharma's related entity Cediprof. The District Court issued findings of fact and conclusions of law, determined that Neolpharma breached the contract, and awarded Kivett damages. For reasons that follow, we will affirm.

I.

Cediprof is a pharmaceutical company, and Neolpharma is the sole manufacturer of Cediprof's pharmaceutical products. The companies are owned by the same family, share offices, and largely have the same executive management.

On April 29, 2013, Kivett and Neolpharma entered into a Representation Agreement, under which Kivett would serve as Neolpharma's independent representative to find new business opportunities. Neolpharma cancelled this agreement on November 29, 2018, and, in December 2018, entered into a modified Representation Agreement with Kivett (the "Second Representation Agreement"). Both agreements provide that Kivett would receive a commission for the completion of any "Business Transaction between Neolpharma and a client directly related with [his] services." Appx. 204, 211;

---

[1] Kivett filed a cross-appeal but did not raise any new issues in his submissions to this Court. He has thus waived all claims on cross-appeal. *See Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994); Fed. R. App. P. 28.1(c)(2).

Appx. 6–7. Both agreements also provide that Kivett would earn commission on business deals executed while the agreements were in effect and up to 36 months after their termination.

Kivett relied on his industry connections to develop new business opportunities for Neolpharma. He arranged meetings between Neolpharma and potential clients interested in Neolpharma or Cediprof products and services and scheduled site visits, but did not participate in negotiations with prospective clients.

In mid-August, 2013, Kivett contacted Michael Block at the Lannett Company about potential business with Neolpharma. No Neolpharma or Cediprof representative had previously contacted Lannett. Although no deal resulted from this initial outreach, Kivett remained in contact with Block. In July 2018, Kivett reached out to Block to arrange a meeting with Neolpharma representative Edwin Placeres respecting several products Lannett considered outsourcing. On August 20, 2018, Kivett contacted Block and proposed Neolpharma manufacture the drug Levothyroxine for Lannett. At the end of August 2018, Kivett arranged a meeting between Block and Placeres about Levothyroxine and other potential business, but the meeting did not result in a deal. After the August 2018 meeting, Lannett representatives traveled to Puerto Rico to audit Neolpharma's facility. Kivett met with Lannett representatives in Puerto Rico, but he did not participate in any negotiations or pricing discussions with Lannett.

On July 3, 2019, Cediprof and Lannett entered into an agreement (the "Main Lannett Agreement") for Cediprof to manufacture certain Lannett products. The agreement was made between Lannett, Cediprof, and their respective "Affiliates,"

3

defined as "any other person or legal entity directly or indirectly controlling or controlled by or under direct or indirect common control with such [p]arty." Appx. 219. The Main Lannett Agreement further specifies that "control" means "the power to direct the management and policies of such person or legal entity directly or indirectly, whether through the ownership of voting securities, by contract or otherwise." Appx. 219-20.

The same day, Lannett and Cediprof also entered into a Distribution Agreement to begin distributing pharmaceutical products, including Levothyroxine. This agreement was similarly made between Lannett, Cediprof, and their respective "Affiliates" and had an effective date of August 1, 2022. Finally, Lannett and Cediprof entered into an Interim Distribution Agreement, effective on the date of termination of the existing distribution agreement between Cediprof and its then-current products distributor through July 31, 2022. This agreement was also made between Lannett, Cediprof, and their respective "Affiliates."

On August 1, 2020, Neolpharma began manufacturing Levothyroxine for Lannett under the Interim Distribution Agreement. Lannett would submit purchase orders to Neolpharma for Levothyroxine, and Neolpharma's net sales of Levothyroxine to Lannett from August 2020 to October 2021 were $15,662,747.88.

Kivett learned about the deal through a Lannett press release and subsequently emailed Marco Monrouzeau, the Chief Financial Officer and Vice President of Administrators at Cediprof and Neolpharma, an invoice for his services. Monrouzeau responded, explaining the proposed Lannett business Kivett procured for Neolpharma was not the business that ultimately materialized. Kivett never received a commission for

4

the Lannett transaction. Kivett brought suit.

The matter proceeded to a bench trial, and the district court issued findings of fact and conclusions of law. Applying Pennsylvania law, the court found the Second Representation Agreement governed any commission that Kivett could receive because it was in effect when the Lannett Agreements were made. Although Neolpharma was not a signatory to the Lannett Agreements, the court concluded that it was a party to the agreements as Cediprof's "Affiliate."[2] Accordingly, the court found Neolpharma's manufacturing work for Lannett qualified as a Business Transaction under the Second Representation Agreement, for which Kivett could be entitled to a commission if the deal was "directly related with the services [he] provided." *Kivett v. Neolpharma, Inc.*, No. 2:20-CV-0664-JDW, 2022 WL 1185885, at *4–5 (E.D. Pa. Apr. 21, 2022).

Because the Second Representation Agreement did not define the phrase "directly related," the court interpreted it to mean "there had to be an uninterrupted connection from [] Kivett's efforts on behalf of Neolpharma to the Lannett Agreements." *Id.* at *5. The court found that the evidence demonstrated the Lannett Agreements resulted directly from Kivett's efforts. Kivett was the first Neolpharma representative to contact Lannett and remained in contact with Lannett for several years. He proposed that Neolpharma could make Levothyroxine for Lannett and arranged a meeting between Neolpharma and Lannett in August 2018. In July 2019, Cediprof and Lannett executed the Lannett Agreements, which planned for Cediprof and its "Affiliates," including Neolpharma, to

---

[2] Neither party challenges on appeal that Neolpharma qualifies as Cediprof's "Affiliate."

5

manufacture Levothyroxine for Lannett. This "unbroken chain of causality" made the Lannett Agreements directly related to Kivett's business-generating efforts. *Id.* at *5.

The court also noted that the Second Representation Agreement's provision providing Kivett commission on any business deal executed up to three years after Neolpharma terminated the Second Representation Agreement reflected the parties' expectation that it might take time for a deal to result from Kivett's efforts. The approximately eleven-month gap between Lannett's visit to Neolpharma's facilities and the execution of the Lannett Agreements was within the timeframe contemplated by Kivett and Neolpharma.

Lastly, the court concluded that defendants offered no credible evidence of intervening circumstances that broke the causal chain between Kivett's efforts and the Lannett Agreements. Monrouzeau testified that Cediprof had sent requests for proposals and that Lannett was one of the companies that responded, but the court found his testimony not credible. Moreover, there was no documentary record evidence supporting Monrouzeau's assertion that Cediprof engaged in requests for proposals or that multiple companies bid for the opportunity. Accordingly, the court found Kivett was entitled to a commission for the Lannett transaction and awarded him $469,882.41 based on the combined calculation of actual and projected net sales of Levothyroxine to Lannett.

## II.

On appeal from a bench trial,[3] we review the district court's findings of fact for

---

[3] The district court had jurisdiction over the matter under 28 U.S.C. § 1332(a)(1). We have jurisdiction under 28 U.S.C. § 1291.

6

clear error and its conclusions of law *de novo*. *VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273, 282–83 (3d Cir. 2014) (citing *McCutcheon v. Am.'s Servicing Co.*, 560 F.3d 143, 147 (3d Cir. 2009)). For mixed questions of law and fact, "we apply the clearly erroneous standard except that the District Court's choice and interpretation of legal precepts remain subject to plenary review." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 201 (3d Cir. 2005). "To the extent that the District Court's conclusions rested on credibility determinations, our review is particularly deferential." *Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am.*, 609 F.3d 143, 156–57 (3d Cir. 2010) (citing *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985)).

Neolpharma asserts it is appealing a factual finding, arguing the court "clearly erred . . . in finding an unbroken chain of causality" between Kivett's efforts and the Lannett deal. Yet Neolpharma does not actually contest any of the court's factual findings. Neolpharma instead appeals a conclusion of law: the court's finding that Kivett's efforts satisfied the "directly related" language of the Second Representation Agreement, entitling him to commission.

Under either standard, the record before us supports the court's conclusion. The Second Representation Agreement between Kivett and Neolpharma provides that Kivett would sell Neolpharma's services and receive a commission for the completion of any "Business Transaction between Neolpharma and a client directly related with [his] services[,]" and that any such commission would be paid if the transaction was executed during the term of the agreement or within thirty-six months after Neolpharma terminated the agreement. Appx. 211.

7

Here, Kivett first contacted Lannett in 2013, remained in contact with Lannett, and then proposed a series of potential business opportunities for Lannett with Neolpharma in August 2018, including the manufacture of Levothyroxine. Prior to then, Kivett arranged for a tour of Neolpharma's facility and meeting between the companies' representatives, during which the parties discussed Levothyroxine. Kivett did not participate in these negotiations, and although the 2018 meetings did not result in an immediate deal, Cediprof and Lannett entered into the Lannett Agreements for the manufacture of Levothyroxine in July 2019. These facts indicate that there was an "unbroken chain of causality" between Kivett's efforts and the Lannett Agreements such that their execution "resulted directly" from his actions.

Neolpharma contends there were intervening events that broke this causal chain, such as the eleven-month gap between the 2018 meetings facilitated by Kivett and the execution of the Lannett Agreements in 2019 and Neolpharma's purported requests for proposal.

Neolpharma predicates its arguments on common-law discussions of commissions for finders or brokers but fails to discuss whether Kivett's actions satisfied the language of the Second Representation Agreement. To the extent that Neolpharma challenges the court's definition of "directly related" by insisting that the phrase requires the relevant series of events occur without delay, its preferred construction differs only slightly from the court's, and conflicts with the business relationship between the parties. *See John F. Harkins Co., Inc. v. Waldinger Corp.*, 796 F.2d 657, 658 (3d Cir. 1986) (explaining that interpretation of contract language is reviewed under the clearly erroneous standard).

8

Neolpharma urges that Kivett took no action in the eleven-month period between his services and the execution of the Lannett Agreements, but Kivett was not required to perform services beyond introducing potential clients to receive commission under the Second Representation Agreement. The court's interpretation of the phrase "directly related" was not clearly erroneous, and Kivett's performance satisfied the contract's terms. *See Id.*

Neolpharma's argument that its requests for proposals broke the causal chain is also unavailing. The court found Monrouzeau's testimony respecting the requests for proposals—the only such evidence in the record—not credible. We will not disturb the court's credibility determination, which was bolstered by an absence of documentary record evidence to support Monrouzeau's testimony. *See Travelers Cas. & Sur. Co.*, 609 F.3d at 156–57.

III.

Accordingly, we will affirm.

9